# OHIO
# CIRCUIT COURT REPORTS
# NEW SERIES.

## Causes Argued and Determined in the Circuit Courts of Ohio.

VOLUME II—NEW SERIES.

## FRAUDULENT CONTRACT FOR THE PURCHASE OF STANDING TIMBER.

[Circuit Court of Lucas County.]

CHARLES W. ISHAM ET AL v. BUCKEYE STAVE CO.

Decided, June 20, 1903.

*Parties—Misjoinder—Rescission of Contract for Sale of Standing Timber—Right of Action as Between Personal Representative and Devisees of the Land—Conversion.*

1. The right of action to declare void a contract, whereby one now deceased sold certain standing timber at a grossly inadequate price, is in the personal representative of the decedent, and not in the devisees of the land from which the timber is being removed.

2. As between the parties here concerned, the trees have been converted into personal property, and in the event of the purchaser being deprived of them in consequence of fraud in the contract of purchase, the trees would remain personal property as between the personal representative of the estate and the devisees of the land; and should the personal representative prosecute an action for rescission of the contract, he would be prosecuting it for the benefit of the personal estate, and not for the benefit of the devisees.

1

PARKER, J.; HULL, J., and HAYNES, J., concur.

This case is in this court on appeal. When the action was begun in the court of common pleas in March, 1902, the plaintiffs were Charles W. Isham, Sarah Isham, John W. Stebbins and John F. Isham, administrator with the will annexed of the estate of John G. Isham, deceased, and the defendant was The Buckeye Stave Company. To that petition a demurrer was filed in the court of common pleas on the grounds, (1) that there was a misjoinder of parties plaintiffs; (2) that several causes of action were improperly joined, and (3) that the petition did not state facts sufficient to constitute a cause of action.

The court below, in passing upon that demurrer, held that it was well taken and sustained it, on the ground that there was a misjoinder of parties plaintiff, and on the ground that it failed to state facts sufficient to constitute a cause of action. Thereupon an amended petition was filed, and from the amended petition Sarah Isham, and John F. Isham, as administrator, were dropped out. To this amended petition a demurrer was filed on the grounds that the plaintiffs, or either of them, had no legal capacity to bring the action, and also that the facts set forth in the amended petition did not, in law, constitute a cause of action in favor of the plaintiffs and against the defendants. That demurrer was overruled, and thereupon an answer was filed, and to the answer a reply was filed. The case was submitted to the court below upon the merits, and from the finding and judgment of that court an appeal was taken to this court.

In this court the defendant asked for and was granted leave to withdraw his answer, for the purpose of again presenting the questions raised by the demurrer to the amended petition. Upon the first presentation of these questions a majority of the court were so clearly of the opinion that the demurrer was not well taken that we resolved to proceed to trial upon the merits, reserving, however, a right to give this subject further consideration; and when the case came to be finally submitted there was more argument heard upon the demurrer, and, after a full consideration of the matter, we are unanimously of the opinion ted to the court below upon its merits, and from the finding and

that the court below erred in overruling the demurrer; and that this court was in error in proceeding upon its first impression. We hold that the demurrer must be sustained on the ground that the facts stated do not constitute a cause of action in favor of the plaintiffs and against the defendant. I will read the averments of the petition:

"The defendant is, and at the time of the occurrences hereinafter set forth was, a corporation organized and existing under the laws of the state of Ohio, and has a place of business in the village of Waterville, Lucas county, Ohio.

"Plaintiffs says that on or about the sixth day of April, 1899, and during the lifetime of John G. Isham, deceased, he was and for a long time prior thereto had been the owner of a tract of land known and described as the west one-half of the southwest one-quarter of section No. 31, in the reservation of twelve miles square in Waterville township, Lucas county, Ohio; and that said land was covered with standing timber.

"Plaintiffs further say that on or about said sixth day of April, 1899, John Fraser, the duly authorized agent of the defendant company, called at the home of said John G. Isham, deceased, and with intent to deceive and defraud said John G. Isham, deceased, and for the purpose of inducing him to part with his said timber at a grossly inadequate price, represented to him that he, the said Fraser, was an expert in estimating the quantity of standing timber; that he was regularly employed by said defendant in buying standing timber and making said estimates; that he had carefully gone over and examined the said piece of property above described, and the timber thereon, and that he estimated the said piece of timber land to contain 50,000 feet of timber, and that it would not contain more than 60,000 feet at the outside.

"Plaintiffs further say that said piece of land at said time instead of containing fifty or sixty thousand feet of timber as so fraudulently alleged and represented by said Fraser, contained about 200,000 feet of timber, all of which said Fraser then and there well knew to be true.

"Plaintiffs further say that said John G. Isham, deceased, at the time said false and fraudulent representations were made to him by said Fraser, as aforesaid, was, and for a long time prior thereto had been, an invalid, was sick and unable to leave the house, and in a weakened condition of mind and body, and that said Fraser well knew said facts to be true; that believing in the honesty and integrity of said Fraser, and being unable to

personally examine into the truth of said statements so fraud-
ulently made on account of his said illness, and not being an
expert in such matters himself, said John G. Isham, deceased,
relied upon the statements and representations so fraudulently
made by said Fraser, and so relying upon said statements and
representations and believing them to be true, agreed to accept
for said timber so standing on said land the sum of $425, and
sold the same to the defendant for said sum.

"Plaintiffs further say that on the ninth day of June, 1901,
said John G. Isham became deceased; that he continued to be an
invalid from the said sixth day of April, 1899, up to the time of
his death, and was unable to leave the house during said time;
that prior to his death, the said John G. Isham, deceased, did
not discover and had no means of discovering that said tract of
land contained more timber than said Fraser had represented it
to contain as aforesaid; that the plaintiffs are the heirs of said
John G. Isham, deceased; and that he left a will, by the terms
of which said land upon which said timber stands was devised
in fee simple to the plaintiffs in the following proportions, sub-
ject to the life estate of Sarah Isham, the widow of said John G.
Isham, deceased:

"To Charles W. Isham the east one-half of the west one-half
of the southwest one-quarter and the north one-half of the west
one-half of the west one-half of the southwest one-quarter of said
Section 31.

"To John W. Stebbins the south one-half of the west one-half
of the west one-half of the southwest one-quarter of said Sec-
tion 31.

"Plaintiffs further say that soon after said contract of sale
was made the defendant entered upon and began to cut and re-
move said timber from said land, and that it has already cut and
removed from said land about 82,000 feet of timber; that there
still remains standing upon said land a much greater quantity
of timber than has thus far been removed, and that said timber
so remaining standing is partly upon the land of each of the
plaintiffs; that said plaintiffs did not discover the aforesaid
fraud of the defendant until after the said 82,000 feet of timber
had been cut and removed; that neither of said plaintiffs is an
expert in estimating the quantity of standing timber and had
not the means of discovering said fraud until they had learned
that said defendant had already removed from said premises a
much greater quantity of timber than its said agent had as afore-
said represented it to contain; that on March 19, 1902, shortly
after the discovery of said fraud, said plaintiffs tendered back
to said defendant in legal tender money of the United States

the said sum of $425 paid by it for said timber, and notified said defendant that they elected to rescind said contract on account of said fraud, and demanded of it that it surrender its said contract of sale and return to them the timber removed from said premises by virtue of said contract, or account to them for the value thereof; and that said defendant refused to accept said sum of $425 and surrender its said contract and return said timber or account to plaintiffs for the value thereof.

"Wherefore, plaintiffs pray the court for a preliminary injunction enjoining and restraining the defendant from cutting or removing any more of said timber, and that on the final hearing hereof the said injunction may be made perpetual; that the said contract for the sale of said timber be declared to be void and of no effect, and for all other proper relief."

Plaintiffs say that John G. Isham, in his lifetime, did not discover that this alleged fraud had been perpetrated; that is the only additional allegation of the amended petition, so far as we can discover, which seems to be very material.

Now the contention of counsel for the defendant is that the right to bring and prosecute this action is not in the devisees of this land; that if such fraud as is alleged was perpetrated so that a right of action arose, it is a right of action devolving upon the personal representatives of John G. Isham.

Plaintiffs, however, insist that it is a matter affecting the lands of which they are the owners, and that the right of action under this contract for the removal of the timber from these lands, which have been devised to them, survives to them, and that, because of their interest in the land, the taking of this timber from the land affects the value of the land, and that therefore they have a right, by injunction, to require that no more of the timber shall be removed; that the result thereof will be that the value of the land will not be diminished by the removal of any more of the timber they have succeeded to; that the value of the timber will remain, the standing timber, as part of the value of their property—part of their property. There is no averment in the petition or amended petition, I might say in passing, that the removal of this timber would affect the value of the land. For aught that appears, either by averment or proof, the value of the land would be increased by the re-

moval of the timber; that is to say, the clearing of the land would be worth more to it than the preservation of the timber standing. But that is a matter that might be changed or corrected by further averment and proof. The objection insisted upon goes to the very bottom of the matter; it strikes at the root. If plaintiffs can maintain any action at all, of any character, it must be on the ground of the alleged fraud.

Now it is evident that the right to sue can not be in both the devisees and personal representatives, they being different persons; that fact appears to have been recognized by the court of common pleas, and so the demurrer to the original petition on account of misjoinder of parties was sustained. Thereupon, as I have said, the personal representatives were dropped out of the case and these plaintiffs undertook to prosecute it. In our judgment the court below was right in sustaining this demurrer on account of misjoinder. But the parties made a mistake in dropping out the personal representatives and retaining the devisees under this will, instead of dropping out the devisees and retaining the personal representatives. If such fraud as is here averred was perpetrated, it was a fraud upon John G. Isham, and it resulted in a cause of action in favor of John G. Isham to recover damages on account of the fraud; and, no doubt also, a cause of action, if he chose to pursue it, to obtain a rescission of the contract. On the other hand, even though the fraud may have been perpetrated, and John G. Isham may have discovered it, it was within his power and his right to waive it and still insist upon the performance of the contract. But as I have said, this amended petition contains the averment that John G. Isham in his lifetime did not discover the fraud. Upon that I may say, however, there is no evidence submitted, except perhaps the single circumstance that John G. Isham was an invalid from the time this contract was made up to the time of his death. Notwithstanding that, however, he may have discovered this fraud and may have waived it after he had discovered it. There is no evidence that he did not. But that is not important to the main question that we are considering, i. e., whether a cause of action survives to the devisees.

Now these devisees, as we view the matter, stand in precisely the same relation to this contract that the grantees of John G. Isham, taking by deed of gift or with knowledge of this contract, would have stood. If timber were in fact standing, under this contract the purchaser thereof would have the right to remove it. Such grantees could not hold it. The devisees are not in a position to complain that enough was not paid for this timber; whether too little or too much was paid or promised for this timber is of no consequence to them.

They acquired no right to any part or share in the consideration paid or promised. Both that paid and that promised, or that due by virtue of the fact that there was deceit, and enough was not paid, wherefore the seller might be entitled to more, was due to the seller, and upon his decease became due to his personal representative, not to the devisees; they were bound to take this land, as I have said, without the timber, and it was a matter of no consequence whatever to them whether half the price of the timber had been paid or promised, or double the price of the timber had been paid or promised. It is averred in the amended petition that they are heirs as well as devisees; but that does not change their standing as plaintiffs here; their standing as heirs would be the same.

The right under this contract to have compensation for the timber, either the compensation promised or further compensation or damages by reason of fraud, was a personal right. It was a chose in action which went, under the law, to the personal representative of John G. Isham. It was the right, as I have said, of John G. Isham in his lifetime to waive the fraud and insist upon the performance of the contract. The same right survived to the administrator. We may suppose that the administrator is content with this contract. We may suppose that he is content to keep this $425, and allow the timber to be taken. What right have the devisees to object to that? What right have they to insist that instead of $425 the personal representative shall have $850, or some other sum; or that he shall have the timber? Clearly the timber can not go to the devisees. Under the doctrine of equitable conversion, if the devisees should prevail in this case, the timber would not go to them; it would

go to the personal representative. Upon that doctrine I may make some further comment and cite some authorities farther on. We may suppose a situation of this kind—a promise to pay for this timber in installments as it is taken, say one-half down and one-half at another time; part of the timber has been taken during the lifetime of John G. Isham; part of it is now due to be taken and paid for; the administrator or personal representative is content that the timber shall be taken and the price paid; but the devisees stubbornly say, "No, there was a fraud perpetrated upon our devisor; he did not get, and therefore his personal estate has not received as much for this timber as ought to have been paid for it; therefore we shall object." We conceive it is not within the power; it is not the right of the devisees to make this objection; that the personal representative has a right to insist that the contract shall be fulfilled; that the timber shall be taken and the price paid for it. The personal representative may not care to interfere. The same result would follow if the timber were to be taken and paid for at so much a thousand as removed. Various illustrations might be given to show the inconsistency of the position of these devisees here. It is made manifest by the attempt made by the devisees to place the purchaser in *statu quo,* so that the right to rescind might be perfected. The devisees undertook to restore to the purchaser by tendering the $425 paid for this timber. If they have never received it, it is not theirs to restore. What they are attempting to do is to interfere here and pay $425 of their own money to thereby effect this object. The $425 received is personal property in the hands of the personal representative. It is not the personal representative who is here seeking to place the purchaser of the timber in *statu quo* by surrendering the same, but those who, we conceive, have no right in this contract.

Suppose a situation of this kind—that the purchaser were complaining that he had not received as much timber as he had contracted for; that a fraud had been perpetrated upon him; against whom would he bring his action? Can he bring it against these devisees? Clearly not. If a cause of action survives to the purchaser of the timber as against the estate, it would survive against the personal representative as a personal

obligation.　There were no contractural relations between the purchaser of the timber and these devisees; no contractural obligations, and it is clearly manifest that if an action on the one hand must be made by the purchaser against the personal representative, the action on the other hand must be by the personal representative against the purchaser.　We think a fair test of that proposition is found in the fact that if the plaintiffs here should prevail, that would not bar the right of action of the personal representative to sue for damages on account of this alleged fraud.　In other words, the devisees, claiming under this will, by beginning an action of this character, even though they may have begun it first, even though they may have been forehanded in the matter, can not deprive the personal representative of the chose in action or of his right to recover damages on account of the fraud perpetrated upon the decedent.　And we think the right to rescind is necessarily in the party having a beneficial interest adverse to the interests of the purchaser of the timber; the party therefore who may waive the fraud; the party therefore who may prosecute an action for damages instead of an action for rescission.

It may be thought, and has been suggested, that if an action of rescission were prosecuted by the personal representative, and he should prevail, the benefit would result to the owners of this land, in that it would preserve this timber upon their land; that they would become the owners of the standing timber.　We do not think this is so.　By this contract there has been an equitable conversion of this timber into personal property, and if this contract should be rescinded, the right to the timber would be restored to the personal representative, and as between the personal representative and the devisees, the former would have a right to go upon this land and take this timber.　If the personal representative should prosecute an action of this character, he would be prosecuting it for the benefit of the personal estate and not for the benefit of the devisees.　Upon this doctrine of equitable conversion I will cite 1 Pomeroy, Eq. Jurisp., Sections 161 and 371, and 3 Pomeroy, Eq. Jurisp., Section 1159.

"The doctrine of 'conversion' is a particular application of the principle that equity regards as done what ought to be done.

The doctrine itself was thus stated by an eminent English equity judge in the leading case upon the subject: 'Nothing is better settled than this principle, that money directed to be employed in the purchase of land, and land directed to be sold and turned into money, are to be considered as that species of property into which they are directed to be converted; and this, in whatever manner the direction is given, whether by will, by way of contract, marriage articles, settlement or otherwise; and whether the money is actually deposited or only covenanted to be paid, whether the land is actually conveyed or only agreed to be conveyed, the owner of the fund, or the contracting parties, may make land money, or money land. The cases establish this rule universally.' "

Much more may it be said of property, like trees, which may be severed from the land and made personal property by a contract. We hold that, as between these parties, the trees would be and were converted into personal property, so that, if the purchaser of these trees should be deprived of them in consequence of fraud in the contract, they would remain personal property as between the personal representative of the estate and the devisees under the will.

I read from 1 Pomeroy, Eq. Jurisp., Section 371:

"One of the most direct and evident results of the principle is the equitable property which arises from the doctrine of conversion—when real estate is treated by equity as personal property, or personal estate as real property; land as money, or money as land—'nothing is better established than this principle that money directed to be employed in the purchase of land, and land directed to be sold and turned into money, are to be considered as that species of property into which they are directed to be converted; and this in whatever manner the direction is given, whether by will, by way of contract, marriage articles, settlement or otherwise, or whether the money is actually deposited, or only covenanted to be paid; whether the land is actually conveyed, or only agreed to be conveyed; the owner of the fund or the contracting parties may make land money or money land.' A conversion may thus take place where, by a will, a deed or family settlement, land is actually assigned to the trustees, with directions in the one case to sell the land and pay over the proceeds to the beneficiary, and in the other to invest the fund in the purchase of the land to be then conveyed to him; or it may, in like manner, take place where, by marriage articles

or other executory agreement, land is covenanted to be conveyed, or money is covenanted to be assigned, in like manner and for like purposes. The effect of the conversion is a direct consequence of the principle in question. Personal estate becomes, to all intents and purposes, in the view of equity, real, and real estate personal. Money directed to be invested in land descends to the heir of the original beneficiary or passes under a general description of real property in his will, while land directed to be converted into money goes to his personal representatives, or is included in a residuary bequest of his 'personal property.' These are some of the incidents of a conversion, and are sufficient at present to illustrate its nature and results."

There is considerable more in this work on this subject and a good many cases cited. Of course this is not a point we are called upon to decide here, but we mention it and discuss it as an illustration of the situation of the parties.

Now, in support of the contention on behalf of the plaintiffs that the right survives to the devisees, we are cited to certain authorities; but they consist of cases where the question arose as to whether the right to set aside a conveyance of the land had survived to the devisees; the questions were not so much as to who could enforce the right of action, as whether it actually survived; and it was decided in those cases that it not only survived, in equity at least, but that it survived to the devisees. But those cases we regard as very different from the case at bar. There the whole equitable interest of the devisor in the land was devised; there was no equitable conversion; there could have been no question as to the right of the personal representative. The land being recovered in a case of that character, would necessarily be the land of the devisees or the heirs, as the case might be. I cite a case somewhat in point, decided not a great while ago by Judge Wildman of the Common Pleas Court of Huron County, Ohio. It is the case of *Stang* v. *Newberger*, 6 N. P., 60:

"The plaintiffs allege substantially that they are the sole beneficiaries under the will of Peter A. Stang, who died in June, 1895, seized in fee simple of certain realty described; that during the lifetime of said decedent he had contracted with Magdalena Newberger, one of the defendants, to convey to her said

realty for $2,785, payable in installments as evidenced by certain promissory notes; and that said vendee had paid to said decedent something over $160, and defaulted as to the residue of the purchase price, as well as to certain other stipulations.''

Now the plaintiffs undertook to tender back the notes and so much of the purchase price as had been paid, and sought to set aside and rescind the contract, and recover possession of the premises.   A demurrer to the petition was sustained on the ground that the right of action was in the personal representative; there are other questions discussed in the case, but I will read from the opinion upon this particular question.   The court says on page 63:

''The plaintiffs sue upon the presumption that they own the land and have a right to remove clouds from their title.   But have they any other than a naked legal title, as trustees for the equitable owners?

''I find no lack of uniformity in the expressions of the courts and text-writers that in this class of cases the doctrine of equitable conversion applies and governs the descent of the estate. By this phrase is meant that doctrine or legal fiction under which, for some purposes, land is deemed personalty and personalty land.   Thus, as stated in 8 Sugden, Vendors (8th Am. Ed.) n. 188:

'' 'When an estate is contracted to be sold, it is in equity considered as converted into personalty from the time of the contract,' etc.

''This language received the approval of Judge Johnson, in *Gilbert* v. *Port,* 28 Ohio St., 276, 298, 299, who says, after quoting Mr. Sugden's words:

'' 'The learned author is discussing the effect of a devise of real estate on lands contracted to be sold and not conveyed.'

''The doctrine finds further recognition and approval in *Smith* v. *Lowenstein,* 50 Ohio St., 346, 357, to which I refer without quoting.

''A more elaborate elucidation of equitable conversion may be found in Pomeroy's admirable work on Equitable Jurisprudence.   See especially Vol. 1, Sections 105, 368, and note on page 403; and Vol. 3, Section 1261.   It is distinctly asserted by the author that the vendor's interest in the contract to sell real estate is personal, and upon his death will descend, not to his heirs or devisees, but to his personal representatives.   It is clearly indicated also that in case of payment of purchase

money by the vendee to such heirs or devisees, the money belongs and should be paid to the personal representative.

"Mr. Sugden (Vendors & Purchasers [9th Ed.] n., star paging 172) says the same:

" 'If the vendor die before payment of the purchase money, it will go to his executors, and form part of his assets.'

"Assuming this doctrine, which seems well settled, to be correct, does it leave any right in the devisees to a rescission of the contract? At the best they would seem· to have received from their ancestors only a naked, legal title to land, while all other rights and interests of Peter A. Stang under the contract descended to the representatives of his personal estate.

"Under proper circumstances a right of election to rescind or affirm a land contract for default of the vendee resides in the vendor. He may elect to sue for the purchase money or endeavor to reclaim the land. At his death this right of election is entirely extinguished or descends to either his personal representative or to his heirs or devisees. It is inconceivable that it can take both directions. If, as asserted by Mr. Pomeroy and Mr. Sugden, and recognized by our own Supreme Court, the estate of the vendor in the land became personalty by conversion, then as such it descended, and the right of election to affirm or disaffirm the contract descended with it. The executor or administrator acquired the right of the vendor to sue for the unpaid purchase money, or at his election to rescind the sale and recover the land. The land, when so recovered by the personal representative, would logically be treated as personalty in the distribution of the decedent's estate. To hold otherwise and permit the devisees to rescind the sale would either rob the personal estate of one of its assets, its chose in action for the unpaid purchase money, or subject the vendee both to the loss of the land and to a possible judgment on the notes in favor of the executor or administrator, an inequity which, of course, is not to be thought of.''

We have no question but this cause of action survived, but in our judgment it is clear that it survived to the personal representative and not to the devisees. Therefore the demurrer to the amended petition will be sustained. The petition will be dismissed, and there will be judgment entered against the plaintiffs for costs.

*Ashton H. Coldham* and *Wilber A. Owen,* for plaintiffs.

*J. J. Moore,* for defendant.